**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CONSOLIDATED RAIL                :
CORPORATION,                     :
                                 :
      Plaintiff,           :      Civil Action No.:    07-1148 (RMU)
                                 :
      v.                   :      Re Document Nos.:   11, 15
                                 :
JAMES T. RAY, for the Estate of  :
HAROLD F. BOYD,                  :
                                 :
      Defendant.           :

## MEMORANDUM OPINION

GRANTING THE DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS;
DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

The plaintiff, Consolidated Rail Corporation ("Conrail"), commenced this action seeking

declaratory relief under the Regional Rail Reorganization Act of 1973 ("Rail Act"), 45 U.S.C. §§

701 *et seq.*, as amended by the Northeast Rail Service Act of 1981 ("NSRA"), 45 U.S.C. §§ 1101

*et seq.*  Conrail seeks a declaratory judgment that the Rail Act precludes it from being held liable

as a successor for asbestos claims stemming from the conduct of insolvent predecessor railroads

whose rail assets were conveyed to Conrail "free and clear of any liens or encumbrances"

pursuant to the Rail Act.  Conrail contends that the "free and clear" provision of the Rail Act,

incorporated into the orders conveying the rail assets to Conrail, forecloses its liability for the

pre-conveyance conduct of the predecessor railroads.

The defendant is the estate of a former employee of Erie Lackawanna Railroad Company

("Erie Lackawanna"), one of the insolvent railroads whose rail assets were conveyed to Conrail

pursuant to the Rail Act.  Alleging that the decedent was negligently exposed to asbestos during his employment with Erie Lackawanna, the estate commenced an action in an Ohio state court against Conrail and other defendants under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq.*  The estate contends that Conrail is liable for the decedent's asbestos-related injuries under state law successor liability principles.

As discussed below, the court concludes that the "free and clear" provision of the Rail Act does not categorically preclude the estate from holding Conrail liable for FELA claims based on the decedent's exposure to asbestos prior to the conveyance of Erie Lackawanna's assets to Conrail.  Put differently, the Rail Act does not prevent the estate from asserting in the Ohio state court action that Conrail may be held liable under the FELA based on state law successor liability principles.[1]  Accordingly, the court grants the estate's motion for judgment on the pleadings and denies Conrail's motion for summary judgment.

## II.  BACKGROUND

### A.  History of the Rail Act

Beginning in the late 1960s, "[a] rail transportation crisis seriously threatening the national welfare was precipitated when eight major railroads in the northeast and midwest region of the country entered reorganization proceedings under § 77 of the Bankruptcy Act."

---

[1]	Whether or not Conrail may be held liable as a successor under state law is not a matter before this court.

*Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 108 (1974).[2]  "Congress concluded that solution of the crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation."  *Id*. at 341-42.  To implement this solution, "Congress supplemented § 77 with the Rail Act, which became effective on January 2, 1974."  *Id*. at 342.  As one senator remarked, the Rail Act was "intended to wipe the slate clean, to allow these rail systems to correct mistakes that led them into financial collapse and to enable them to start anew and continue on a profitable basis."  119 Cong. Rec. S23,784 (daily ed. Dec. 21, 1973) (statement of Sen. Long).

The Rail Act created a government corporation, the United States Railway Corporation ("USRA"), tasked with creating a Final System Plan for restructuring the railroads.  45 U.S.C. § 716(a)(1).  The Final System Plan, published by the USRA in July 1975, designated certain rail properties held by the railroads in reorganization for transfer to a newly-formed private corporation, Conrail.  Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 7 & Ex. B; *see also* 45 U.S.C. § 741(d).  As required by the Rail Act, the USRA submitted the Final System Plan to Congress, which approved the plan shortly thereafter.  Pl.'s Mot. at 8; *see also* 45 U.S.C. § 718(a).

The Rail Act also called for the creation of a Special Court, which would have exclusive jurisdiction over proceedings relating to the Final System Plan.  45 U.S.C. § 719.  Following Congress's approval of the Final System Plan, the Special Court would issue conveyance orders, directing the trustee of each railroad in reorganization to convey all right, title and interest in the

---

[2]        Section 77 of the Bankruptcy Code, repealed in 1978, authorized the bankruptcy court to approve a plan of reorganization containing provisions "modifying or altering the rights of creditors" and to transfer property to the debtor or to another corporation "free and clear of all claims of the debtor, its stockholders and creditors."  *Schweitzer v. Consol. Rail Corp.*, 758 F.2d 936, 941 (3d Cir. 1985) (citing 11 U.S.C. § 205 (repealed 1978)).

designated rail properties to Conrail.[3]  28 U.S.C. § 743(b)(1).  The Rail Act required that "[a]ll

rail properties conveyed to [Conrail] . . . be conveyed free and clear of any liens or

encumbrances."  *Id*. § 743(b)(2).

### B.  Conveyance of Eric Lackawanna's Assets to Conrail

In June 1972, Erie Lackawanna filed for bankruptcy pursuant to § 77 of the Bankruptcy

Code.  *See In re Erie Lackawanna Ry. Co.*, 803 F.2d 881, 882 n.2 (6th Cir. 1986).  In March

1976, the Special Court ordered Erie Lackawanna and various other railroads to convey the bulk

of their rail assets to Conrail ("the Conveyance Order"), pursuant to § 743 of the Rail Act.  Pl.'s

Mot. at 8; *see generally* Compl., Ex. B.

Following the conveyance of a railroad's assets to Conrail, the Rail Act required the

bankruptcy court "to reorganize or liquidate such railroad in reorganization pursuant to Section

77 on such terms as the court deems just and reasonable."  45 U.S.C. § 791(b)(4).  The

conveyance of Erie Lackawanna's assets to Conrail left it with insufficient resources to permit it

to be reorganized as an ongoing business entity.  *Erie Lackawanna*, 803 F.2d at 882.

Accordingly, in November 1982, the bankruptcy court discharged Erie Lackawanna from

---

[3]      In 1997, Congress transferred the exclusive jurisdiction of the Special Court to the United States
District Court for the District of Columbia.  *See Niagara Mohawk Power Corp. v. Consol. Rail
Corp.*, 97 F. Supp. 2d 454, 456 (S.D.N.Y. 2000) (citing 45 U.S.C. § 719(b)(2)).  Because
Conrail's claims require judicial interpretation of the Conveyance Order, this court has
jurisdiction over the case.  *See* 45 U.S.C. § 719(e)(2) (providing that "[t]he original and exclusive
jurisdiction of the special court shall include any action, whether filed by any interested person or
initiated by the special court itself, to interpret, alter, amend, modify, or implement any of the
orders entered by such court pursuant to section 743(b)"); *Consol. Rail Corp. v. Ritter*, 593 F.
Supp. 2d 107, 111 (D.D.C. 2009) (holding that the court had jurisdiction over Conrail's action for
a declaratory judgment that the Rail Act precluded Conrail's successor liability for the
defendants' FELA claims); *Consol. Rail Corp. v. United States*, 883 F. Supp. 1565, 1571 (Sp. Ct.
R.R.R.A. 1995) (noting that the interpretation of conveyance orders, the Final System Plan, the
statutes creating the Final System Plan and the conveyance documents are matters falling within
the jurisdiction of the Special Court).

bankruptcy as Erie Lackawanna, Inc., whose purpose was "to liquidate its remaining assets as expeditiously as practicable." *Id.* at 883.

### C.  The Estate's Claims Against Conrail

The decedent was a railroad worker employed by Erie Lackawanna from May 1942 through March 1976.  Pl.'s Mot. at 4.  Following the conveyance of Erie Lackawanna's rail assets to Conrail, he worked for Conrail from April 1976 until his retirement in 1978.  *Id.*  On May 8, 2002, the executor of Boyd's estate filed a complaint in a state court of Ohio ("the Ohio complaint") against various railroad defendants, including Conrail.  *Id.*; *see generally* Compl., Ex. A.  The Ohio complaint alleges that during the course of his employment as a railroad worker, the decedent was negligently exposed to asbestos, in violation of the FELA.[4]  Compl., Ex. A ¶¶ 11-12.  The Ohio complaint further alleges that the decedent's exposure to asbestos resulted in his developing of mesothelioma and caused him severe injury, ultimately resulting in his progressive disability and death.  *Id.* ¶¶ 14-15.  Through the Ohio state court action, the estate seeks to hold Conrail liable for the decedent's exposure to asbestos by Erie Lackawanna prior to the April 1976 conveyance.  *See id.* ¶ 2.

### D.  Procedural History

Conrail filed this complaint on June 26, 2007, seeking a declaratory judgment that the Rail Act precludes the estate from holding it liable for the decedent's pre-conveyance exposure to asbestos by Erie Lackawanna.  *See generally* Compl.  In addition, Conrail asks the court to enjoin the estate from seeking to hold Conrail liable for any FELA violations committed by Erie Lackawanna.  *See generally id.*  By agreement, the parties stayed the Ohio action pending the resolution of this action.  *See* Def.'s Mot. for J. on the Pleadings ("Def.'s Mot.") at 2.

---

[4]     The estate has also asserted state law claims against various asbestos manufacturers.  *See generally* Compl., Ex. A.

On June 12, 2009, the estate moved for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure 12(c).  *See generally* Def.'s Mot.  On July 2, 2009, Conrail moved for

summary judgment.  *See generally* Pl.'s Mot.  Both motions address the same core issue:

whether the Rail Act precludes the estate from asserting successor liability against Conrail for

the decedent's pre-conveyance exposure to asbestos while employed by Erie Lackawanna.  With

both motions now fully submitted, the court turns to the applicable legal standards and the

parties' arguments.

## III.  ANALYSIS

### A.  Legal Standard for a Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) states that "[a]fter the pleadings are closed but

within such time as not to delay the trial, any party may move for judgment on the pleadings."

*See* FED. R. CIV. P. 12(c).[1]  If a party files a Rule 12(c) motion before the answer, the court may

treat it as a motion to dismiss under Rule 12(b)(6).  *See Seber v. Unger*, 881 F. Supp. 323, 325

n.2 (N.D. Ill. 1995).  "In fact, any distinction between them is merely semantic because the same

standard applies to motions made under either subsection."  2 FED. PRAC. 3d § 12.38, 12-101; *see*

*also GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995).

Under Rule 12(c), the court must accept the nonmovant's allegations as true and should

view the facts in the light most favorable to the nonmovant.  *See Judicial Watch, Inc. v. Clinton*,

880 F. Supp. 1, 7 (D.D.C. 1995).  The court should grant a motion for judgment on the pleadings

---

[1]     Rule 12(c) also states that if, on a motion for judgment on the pleadings, the court considers
matters outside the pleadings, then the court shall treat the motion as one for summary judgment
pursuant to Rule 56.  In its analysis, the court will not consider any matters outside the pleadings,
and will therefore treat the motion as one for judgment on the pleadings pursuant to Rule 12(c).

if the movant "is entitled to judgment as a matter of law." *See Burns Int'l Sec. Servs. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995).

### B.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir.

1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006).

### C.  The Rail Act Does Not Categorically Preclude Conrail's Successor Liability for Latent FELA Claims

In its motion for judgment on the pleadings, the estate points out that in *Consolidated*

*Rail Corporation v. Ritter*, 539 F. Supp. 2d 368 (D.D.C. 2009) (Urbina, J.) ("*Ritter I*"), a case

practically indistinguishable from the present action,[5] this court held that the Rail Act does not

preclude successor liability against Conrail for the pre-conveyance conduct of Erie Lackawanna.

*See* Def.'s Mot. at 1.  Conrail had argued in *Ritter I*, as it does in this case, that the language in

the Rail Act requiring the Special Court to convey the defunct railroads' assets to Conrail "free

and clear of any liens or encumbrances" precluded Conrail's successor liability for tort claims

based on the pre-conveyance actions of Erie Lackawanna.  *Ritter I*, 539 F. Supp. 2d at 371.  In

granting the defendants' motion to dismiss for lack of jurisdiction, the court rejected Conrail's

interpretation of the Rail Act, holding that both "lien" and "encumbrance" denoted interests in

property rather than interests protected by tort law.  *Id*. at 371-72.

The estate acknowledges that the court subsequently vacated its holding in *Ritter I* in

*Consolidated Rail Corporation v. Ritter*, 593 F. Supp. 2d 107 (D.D.C. 2009) ("*Ritter II*").  Def.'s

Mot. at 3.  Given the fact that the only matter properly before the court in *Ritter I* was the

defendants' motion to dismiss for lack of jurisdiction, the court concluded that it had

"prematurely" undertaken the task of interpreting whether the Rail Act precluded Conrail's

---

[5]     *Ritter I* concerned a declaratory judgment action brought by Conrail against former employees of
Erie Lackawanna who had commenced an action in Pennsylvania state court against Conrail to
recover for injuries that allegedly stemmed from their pre-conveyance exposure to asbestos.
*Consol. Rail Corp. v. Ritter*, 539 F. Supp. 2d 368, 370 (D.D.C. 2009).  As in this case, Conrail
sought a declaratory judgment that the Rail Act precluded the defendants from asserting
successor liability against Conrail for the pre-conveyance actions of Erie Lackawanna.  *Id*. at
371.

successor liability for the actions of Erie Lackawanna.  *Ritter II*, 539 F. Supp. 2d at 110 (granting

Conrail's motion for relief upon reconsideration and holding that as a Special Court under the

Rail Act, the court had jurisdiction to consider Conrail's claims, which required an interpretation

of a conveyance order).  The estate argues, however, that "nothing in *Ritter II* in any way calls

into question the correctness of *Ritter I*'s analysis of the merits."[6]  Def.'s Mot. at 3-4.

Accordingly, the estate contends that state law successor liability principles should govern

Conrail's liability for the estate's claims.  *See generally* Def.'s Mot.; Def.'s Reply at 2 n.1.

 In its motion for summary judgment, Conrail maintains that the Rail Act precludes the

estate from holding it liable as a successor to Erie Lackawanna.  *See generally* Pl.'s Mot.  More

specifically, Conrail argues that the provision of the Rail Act directing the conveyance of rail

assets to Conrail "free and clear of any liens or encumbrances" precludes Conrail's successor

liability for Erie Lackawanna's pre-conveyance FELA violations.  *See id*. at 10-19.  Such an

interpretation is mandated, Conrail argues, by the fact that the Rail Act embodied a legislative

intent to give Conrail a "fresh start," free from the burdensome liabilities that had contributed to

the financial collapse of the predecessor railroads.  *Id*. at 6-7.  Conrail contends that

> [i]mplicit in the design of the Rail Act is the premise that *in personam* claims,
> including general unsecured claims asserting successor liability, would not and
> could not follow the assets conveyed to Conrail pursuant to the Rail Act.  Rather,
> those interests were to be retained by and relegated to the estates of the transferor
> railroads in reorganization under § 77 of the Bankruptcy Act.

*Id*. at 13.  Conrail notes that at least one court refused to impose successor liability on Conrail for

FELA claims arising out of an individual's pre-conveyance exposure to asbestos, holding that

such liability remains with the reorganized debtor.  *Id*. at 14-15.

---

[6]  The court did not thereafter address the merits of the parties' arguments in *Ritter*, as the parties
filed a stipulation of dismissal with prejudice shortly after the court granted Conrail's motion for
relief upon reconsideration.  *See Consol. Rail Corp. v. Ritter*, No. 07-1370 (D.D.C. Jan. 15,
2009), Joint Stipulated Dismissal With Prejudice.

The court begins its assessment of the parties' arguments by analyzing the "free and clear" language of the Rail Act incorporated into the Conveyance Order.

**1. The Plain Language of the Rail Act's "Free and Clear" Provision Does Not Foreclose Conrail's Successor Liability**

As Conrail states, "[t]he narrow question before this Court, sitting as the Special Court, is whether the 'free and clear or liens and encumbrances' language of the asset conveyance order excluded liability for asbestos claims asserted by employees who once worked for those railroads in reorganization and who may have later worked for Conrail." *Id.* at 2.  The starting point for this analysis is the plain language of the text. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (observing that "[t]he starting point in discerning congressional intent is the existing statutory text") (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000) (noting that "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms") (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989)).

As this court observed in *Ritter I*, when Congress enacted the Rail Act in 1973, "a 'lien' was defined as '[a] charge or security or incumbrance upon property.'  'Incumbrance,' in turn, was defined as '[a]ny right to, or interest in, land which may subsist in another to the diminution of its value.'"  *See Ritter I*, 539 F. Supp. 2d at 371 (citing *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007) (quoting BLACK'S LAW DICTIONARY 908, 1072 (4th ed. 1951)) (internal citation omitted)).  Likewise, the Bankruptcy Code defines the term "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37).  Thus, the plain language of the statute indicates that the "free and clear" language incorporated into the Conveyance Order

provided for the transfer of the assets free from certain *in rem* interests in the property conveyed.

*See id*.  As the court noted in *Ritter I*, nothing in the text indicates that the "free and clear"

provision insulated Conrail generally for *in personam* tort liabilities.  *Ritter I*, 539 F. Supp. 2d at

371.

Indeed, the Special Court previously rejected an effort by Conrail to expand the meaning

of the Rail Act's "free and clear" provision in the manner proposed here.  *See Penn Cent. Corp.*

*v. United States*, 862 F. Supp. 437, 462 (Sp. Ct. R.R.R.A. 1994).  In *Penn Central*, Conrail

sought a declaratory judgment and injunction barring claims against it under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") based on the

pre-conveyance conduct of the insolvent railroads.  *Id*. at 444.  Conrail argued that the "free and

clear" provision of the Rail Act functioned as "a broad statutory codification of the fresh start

policy" that precluded liability for pre-conveyance CERCLA claims.  *Id*. at 462.  The Special

Court rejected Conrail's interpretation of the provision:

> In contrast to the purpose the railroads ascribe to it, the 'free and clear' provision
> was designed to verify the conveyance of marketable title vis-a-vis the properties.
> No evidence exists that this language was additionally intended to insulate the
> defendants from the type of statutory liability at issue here or any other
> obligations.  Accordingly, the 'free and clear' provision is meaning[less] in the
> face of the government's CERCLA enforcement action.
>
> This construction is borne out by a textual analysis as well.  Neither the term
> 'lien' nor 'encumbrance', taken in its ordinary legal meaning, could encompass a
> statutory claim for the recovery of cleanup costs.

*Id*.; *see also id*. at 462 n.93 (observing that "[a] lien is a claim or charge on property as

security for an obligation" and that "[a]n encumbrance similarly affects title to real

property").[7]

Conrail attempts to analogize the "free and clear" provision of the Rail Act to § 363(f) of the Bankruptcy Code, which permits a sale of property "free and clear of any interest in such property" and has been interpreted to preclude successor tort liability against purchasers of assets under that provision. Pl.'s Mot. at 11. For instance, in *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003),[8] the Third Circuit held that American Airlines, which had purchased assets of TWA "free and clear of any interest in such property" under § 363(f), could not be held liable for the undischarged employment discrimination claims of former TWA employees. *Id*. at 289-90. The Third Circuit based its holding on the fact that § 363(f) authorized the sale of assets free and clear of "any interest" in the property, rather than of merely *in rem* interests. *See id*. at 289 (observing that "while the plain meaning of the phrase 'interest in such property' suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to *in rem* interests, strictly defined") (quoting *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996)). The court reasoned that Congress intended the term "any interest" to be construed broadly so as to encompass "obligations that are connected to, or arise from, the property being sold." *Id*. at 289 (quoting *Folger Adam Sec. Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000)). Accordingly, the Third Circuit concluded that

---

[7]      The *Penn Central* court ultimately held that the deeds for the conveyed rail properties, which contained language disclaiming Conrail's liability for any actions or events prior to conveyance, together with the fresh start policy embodied in the Rail Act, shielded Conrail from pre-conveyance CERCLA liability. *Penn Cent. Corp. v. United States*, 862 F. Supp. 2d 437, 463-64 (Sp. Ct. R.R.R.A. 1994).

[8]      *In re Trans World Airlines* has been described as the leading case on the construction of § 363(f). *See In re Chrysler LLC*, 405 B.R. 84, 111 (S.D.N.Y. 2009).

> [w]hile the interests of the [plaintiffs] in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests . . . they are interests in property within the meaning of section 363(f) in the sense that they arise from the property being sold.

*Id*. at 290.

Yet the Third Circuit reached its holding by expressly distinguishing the term "any interest" from a more limited term, such as a "lien," which would have designated only *in rem* interests. *Id*. at 290 (noting that "to equate interests in property with only *in rem* interests such as liens would be incompatible with section 363(f)(3), which contemplates that a lien is but one type of interest") (citing 11 U.S.C. § 363(f)(3));[9] *see also In re WBQ P'ship*, 189 B.R. 97, 105 (E.D. Va. 1995) (noting that "since 'lien' is a defined term under the Bankruptcy Code, it stands to reason that Congress would have used the term 'lien' instead of 'interest,' had it intended to restrict the scope of § 363(f) to liens" and observing that "[o]ther courts have indicated that the term 'interest' is broad, covering more than mere liens").  Given that the Rail Act and the Conveyance Order provided for the transfer of property free and clear of "liens" and "encumbrances" specifically, rather than "any interest" in the transferred rail properties generally, the authorities construing § 363(f) of the Bankruptcy Code provide little support for Conrail's interpretation of that provision of the Rail Act.

### 2.  The Purpose and Design of the Rail Act Do Not Demand a More Expansive Interpretation of the "Free and Clear" Provision

Conrail also asserts that a more limited reading of the "free and clear" conveyance language would be inconsistent with the purpose and design of the Rail Act, which contemplated

---

[9]    Section 363(f) provides that one of the circumstances under which the trustee may sell property "free and clear of any interest in such property" is if "such interest is a lien."  11 U.S.C. § 363(f)(3); *see also id*. § 363(f)(4) (authorizing the sale "free and clear of any interest in such property" if "such interest is in bona fide dispute").

that liability for the pre-conveyance actions of the predecessor railroads would remain with the reorganized railroads so as to give Conrail a "fresh start."[10]  Pl.'s Mot. at 13-16, 21-25; Pl.'s Reply at 6-8.  In *Consolidated Rail Corporation v. Reading*, 654 F. Supp. 1318 (Sp. Ct. R.R.R.A. 1987), however, the Special Court rejected the argument that the application of common law successor liability principles to Conrail in the context of FELA claims would undermine the legislative objectives underlying the Rail Act.  *Id.* at 1331-32 (holding that the NRSA did not preempt common law successor liability for claims brought by rail workers allegedly injured through pre-conveyance exposure to asbestos).  In *Reading*, Conrail had argued that allowing a state to apply common law successor liability principles would permit an unpredictable but large influx of liability claims, which would drain Conrail financially and thereby interfere with the Rail Act's objective of creating an economically viable rail system.  *Id.* at 1331.  The Special Court found Conrail's reasoning unpersuasive:

> There is no doubt that Congress intended to create a viable rail system.   Nor is there any question that Congress sought to insulate Conrail from certain liabilities, and also in enacting NRSA sought to reduce the expense of employee benefit programs . . . .  For example, § 702 [of the NRSA] enabled Conrail to reduce the number of employees substantially and provided a substantially lower level of labor protection benefits to the terminated employees.  However, these provisions do more than demonstrate Congress' intent to limit sources of financial burden.  The fact that Congress listed and expressly limited some burdens suggests that this court should be wary of expanding that list simply on the basis of Congress' silence.
>
> The principal problem with Conrail's argument is that there is just no indication that Congress regarded the possibility of successor tort liability to be an obstacle to Conrail's continued operations, unlike Congress' explicit finding that the crippling burden of employee protective benefits posed an obstacle to the purposes of the Rail Act.

*Id.* at 1332 (internal citations omitted).

---

[10]     The court notes that although Conrail's arguments allude to the possibility of implied preemption of state successor liability law, Conrail does not expressly assert such a theory, instead confining its arguments to the construction of the Rail Act.  *See generally* Pl.'s Mot.; Pl.'s Reply.

In reaching its conclusion, the *Reading* court analyzed 45 U.S.C. § 797h(b), a provision of the NRSA that required Conrail to process and pay all personal injury claims asserted against a "railroad in reorganization," and called for Congress to reimburse Conrail for any such payments.[11]  *Id.* at 1333.  The court acknowledged that by its express terms, this provision applied only during the period when a railroad was in reorganization, and did not specify "who should assume liability for claims for occupational injuries which did not manifest themselves until after the bankrupt railroads had been reorganized and were no longer 'railroads in reorganization.'"  *Id.*  Nonetheless, the *Reading* court considered this provision a significant indicator of Congress's intent:

> We must assume that Congress knew that railroad workers were susceptible to latent occupational diseases which might not manifest themselves until after the bankrupt railroads had been reorganized and discharged in bankruptcy; and that it also knew that such workers would not be able to avail themselves of the unique opportunities provided by [§ 797h(b)].  However, Congress' failure to make specific provisions for these employees in the Rail Act can hardly be interpreted as a determination that they be bereft of any otherwise available remedy.  There is no discernible reason to suppose that the same Congress which expressly provided that workers who had the opportunity to bring FELA claims for preconveyance injuries prior to the consummation of bankruptcy proceedings would be entitled to full and expedited relief intended, *sub silentio*, to foreclose any available remedy from those workers who did not (and through no fault of their own could not) file identical claims until after their former employers had been discharged in bankruptcy.  At any rate we find no basis for inferring such congressional intent.

 *Id.*  Thus, the Special Court perceived no incompatibility between the "fresh start" policy of the Rail Act and Conrail's potential successor liability for FELA claims.  *See id.*

Conrail attempts to distinguish *Reading* by noting that that court's jurisdiction extended only to interpreting the terms of the NRSA and that the Special Court in that case did not interpret a conveyance order or any provisions of the Rail Act.  Pl.'s Mot. at 20-21; Pl.'s Reply at

---

[11]    Conrail notes that this provision of the NRSA replaced a virtually identical provision of the Rail Act.  Pl.'s Mot. at 20 (citing 45 U.S.C. § 774(g) (repealed 1981)).

4.  Conrail does not, however, explain how this feature of the *Reading* case undermines the force of its analysis, which addressed the effect of the fresh start policy underlying Congress's rail reorganization efforts on FELA claims against Conrail.  *See Reading*, 654 F. Supp. at 1331-32. Indeed, in *Penn Central*, the Special Court relied on *Reading* in concluding that the fresh start policy of the Rail Act, standing alone, did not preclude Conrail's successor liability for CERCLA claims.  *See Penn Central*, 862 F. Supp. at 461-62 (noting that "CERCLA or other environmental damage liability simply was of no moment to Congress" at the time it implemented the Rail Act as there was "'just no indication that Congress regarded the possibility of successor tort liability to be an obstacle to Conrail's continued operations'") (quoting *Reading*, 654 F. Supp. at 1331-32).  Accordingly, the court is unpersuaded by Conrail's efforts to distinguish *Reading* from this case.

As for Conrail's argument that § 77 of the Bankruptcy Code relegated the latent tort claims of former rail workers to the estates of the insolvent railroads, *see* Pl.'s Mot. at 12-14; Pl.'s Reply at 7-8, at least one court has held that § 77 does not discharge the latent FELA claims of former rail workers whose symptoms did not manifest themselves until after the conclusion of the bankruptcy proceedings.  *See Schweitzer v. Consol. Rail Corp.*, 758 F.2d 936, 943-44 (3d Cir. 1985) (reversing the bankruptcy court's determination that the latent FELA claims of former rail workers were discharged as a result of the insolvent railroad's § 77 bankruptcy proceedings). The Third Circuit in *Schweitzer* noted that although § 77 "clearly provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company," it was "equally clear that plaintiffs' rights only could have been affected by the discharge of all 'claims' against their employer if they had 'claims' within the meaning of section 77 prior to the consummation date of their employer's reorganization."  *Id*. at 941.

Because the rail workers did not have dischargeable FELA "claims" during the pendency of the § 77 proceedings, the § 77 proceedings had no impact on the plaintiffs' FELA claims. *Id.* at 943-44. Likewise, this court concludes that § 77 of the Bankruptcy Code did not relegate the latent FELA claims to the estates of the insolvent railroads.[12]

In sum, the court concludes that confining the "free and clear" conveyance language of the Rail Act to "liens" and "encumbrances" does not undermine the design and scheme of the Rail Act. Nothing in the legislative history or design of the Rail Act persuades the court to stretch the meaning of the "free and clear" provision beyond the plain meaning of the text.

### 3. The Authorities Relied on by Conrail Do Not Support its Broad Construction of the "Free and Clear" Provision

Conrail relies on a number of prior Special Court decisions declining to hold Conrail liable for certain pre-conveyance obligations of the predecessor railroads. *See* Pl.'s Mot. at 21-25. Yet each of these decisions is fundamentally distinct from the case at hand. *See id.* First, each case revolved around an effort to hold Conrail liable for obligations arising directly out of the use of rail property transferred to Conrail by virtue of the Rail Act. *See Stratford Land & Improvement Co. v. Blanchette*, 448 F. Supp. 279, 284-85 (Sp. Ct. R.R.R.A. 1978) (holding that Conrail was not liable for unpaid costs incurred in purchasing "side tracks" running from the Penn Central rail line to an industrial park owned by the plaintiff); *Consol. Rail Corp. v. Pa.*

---

[12]     Conrail also suggests that imposing successor liability on it would "be inconsistent with the asset valuations made at the time of the conveyances because such liability would have the effect of reducing the value of the assets conveyed to Conrail." Pl.'s Mot. at 16. There is, however, no reason to suppose that the asset valuations did not reflect the potential risk of latent FELA claims, which the parties were plainly aware of during the conveyancing process. *See Penn Cent. Corp. v. United States*, 862 F. Supp. 437, 464 (Sp. Ct. R.R.R.A. 1994) (observing that "FELA claims existed and were known at the time the predecessor conveyed its assets to the successor railroad" and that "the parties would have been well-versed in FELA claims" such that "the valuation and subsequent releases from future liability in the conveyancing process would have taken tort claims brought under FELA into account").

*Dep't of Gen. Servs.*, Civ. Action No. 97-RR-01 (Sp. Ct. R.R.R.A. Mar. 24, 1997) (Mem. Op. &
Order) at 6-7 (holding that Conrail was not liable for unpaid costs incurred in the construction of
a convention center transferred by Penn Central to Conrail); *City of Philadelphia v. Consol. Rail
Corp.*, Civ. Action No. 96-RR-01 (Sp. Ct. R.R.R.A. Nov. 3, 1997) (Mem. Op. & Order) at 14-16
(holding that Conrail and its successor, Amtrak, were not liable for the maintenance or repair of a
bridge over which Penn Central held a right of way that it transferred to Conrail pursuant to the
Rail Act).  The claims asserted against Conrail in those cases involved precisely the type of *in
rem* interests that fall within the plain language of the Rail Act's "free and clear" provision;
accordingly, they offer no support for Conrail's contention that the "free and clear" language
foreclosed Conrail's successor liability for *in personam* tort claims.

Moreover, in each of those Special Court decisions, the documents conveying title of the
subject property from the predecessor railroad to Conrail expressly disclaimed Conrail's liability
for pre-conveyance obligations arising out of the property.  *See Stratford*, 448 F. Supp. at 282
(noting that the Bill of Sale and Assignment between Penn Central and Conrail expressly
reserved and excepted from the conveyance to Conrail obligations associated with the
construction or purchase of industrial "side tracks"); *Pa. Dep't of Gen. Servs.*, Civ. Action No.
97-RR-01 (Sp. Ct. R.R.R.A. Mar. 24, 1997) (Mem. Op. & Order) at 2-3 (noting that "the deed
and accompanying bill of sale contained language limiting Conrail's liability for obligations
accruing prior to the date of delivery of the deed"); *City of Philadelphia*, Civ. Action No. 96-RR-
01 (Sp. Ct. R.R.R.A. Nov. 3, 1997) (Mem. Op. & Order) at 3 (noting that the bill of sale
transferring rail property to Conrail "expressly reserved and excepted from conveyance all
agreements for 'the maintenance and security of rail properties, real or personal, which are not
conveyed to [Conrail]'").  Conrail's express disclaimer of liability for these pre-conveyance

liabilities played a central role in the court's reasoning in each case. *See Stratford*, 448 F. Supp. at 284-85 (rejecting the plaintiff's argument that the Final System Plan nullified Conrail's express disclaimers of liability in the bill of sale); *Pa. Dep't of Gen. Servs.*, Civ. Acton No. 97-RR-01 (Sp. Ct. R.R.R.A. Mar. 24, 1997) (Mem. Op. & Order) at 6 (observing that "[t]he fresh start policy embodied in the Rail Act, *and incorporated into the conveyancing documents*, creates a bright line date upon which the liability of Penn Central ended and the liability of Conrail began") (emphasis added); *City of Philadelphia*, Civ. Action No. 96-RR-01 (Sp. Ct. R.R.R.A. Nov. 3, 1997) (Mem. Op. & Order) at 10 (same). Absent any evidence that Conrail expressly disclaimed liability for pre-conveyance asbestos exposure of Erie Lackawanna employees, *see generally* Compl.; Pl.'s Mot.; Pl.'s Reply, these Special Court cases are fundamentally distinct from the case at hand.

Finally, to the extent that the aforementioned Special Court cases suggest that the Rail Act's fresh start policy is sufficient, standing alone, to extinguish Conrail's liability for the pre-conveyance actions of the predecessor railroads,[13] the court considers this reasoning unpersuasive. As previously discussed, there is no indication that the Rail Act's fresh start policy was intended to extinguish successor tort liability. *See Reading*, 654 F. Supp. at 1331-32. Furthermore, in concluding that the fresh start policy did not by itself extinguish Conrail's CERCLA liability, the Special Court observed that "[t]he crucial distinction between the Bankruptcy Code and the Rail Act is that the Code actually codified a fresh start scheme, whereas under the Rail Act it is just a pervasive policy. In this sense, the fresh start policy in the Rail Act is less compelling than its sister statute." *Penn Cent.*, 862 F. Supp. at 461. This court

---

[13]     *See, e.g.*, *Consol. Rail Corp. v. Pa. Dep't of Gen. Servs.*, Civ. Action No. 97-RR-01 (Sp. Ct. R.R.R.A. Mar. 24, 1997) (Mem. Op. & Order) at 6-7 (stating that "[a]ny recovery in contract, tort or otherwise for the conduct of Penn Central was legislatively and contractually apportioned to be satisfied out of the assets of the bankrupt railroad").

cannot conclude, based merely on the implications of a pervasive but uncodified legislative policy, that Congress intended to extinguish all latent FELA claims of rail workers employed by the predecessor railroads.[14]  *See Reading*, 654 F. Supp. at 1331-32.

Conrail also directs the court to a number of non-Special Court decisions that purportedly support its interpretation of the Rail Act.  *See* Pl.'s Mot. at 25-27.  Chief among these is *Schweitzer v. Consol. Rail Corporation*, 65 B.R. 794 (E.D. Pa. 1986), in which the court rejected a reorganized debtor's effort to shift liability for latent FELA claims to Conrail.  *See id.*; Pl.'s Reply at 1-3.  More specifically, *Schweitzer* concerned the FELA liability of the Reading Company, the entity that emerged from the reorganization of the insolvent Reading Railroad. *See Schweitzer*, 65 B.R. at 796.  Pursuant to the Rail Act and the Bankruptcy Code, Reading Railroad's rail assets were conveyed to Conrail, while its non-rail assets (principally, real estate holdings and claims against the government) were transferred to the Reading Company.  *Id.*  The Reading Company argued that any liability for the latent FELA claims of former Reading rail workers exposed to asbestos during their employment with the Reading Railroad fell to Conrail rather than the Reading Company.  *Id.* at 799.  The Reading Company's argument was based on the bankruptcy principle that non-discharged claims that could have been asserted against the insolvent debtor may be asserted against the reorganized company that emerges from bankruptcy proceedings.  *See id.*  The Reading Company argued that the Rail Act and the Bankruptcy Code effectively resulted in two reorganized companies emerging from Reading Railroad's

---

[14]    For the same reason, the non-Special Court decision cited by Conrail concerning Conrail's liability for employment discrimination claims does not persuade the court to reach a different result.  *See Howard v. Penn Cent. Transp. Co.*, 87 F.R.D. 342, 348 n.8 (N.D. Ohio 1980) (holding that Conrail could impose equitable remedies but not monetary damages in a discrimination case asserted by former rail worker, while noting that "it is difficult to believe that Congress would have eliminated the possibility of obtaining from Conrail post-conveyance relief for pre-conveyance race discrimination without expressly so stating").

insolvency: Conrail, the reorganized company with respect to the Reading Railroad's rail operations, and the Reading Company, the reorganized company with respect to the debtor's non-rail operations. *Id.* Under this theory of "dual reorganization," the plaintiffs' asbestos claims would be Conrail's responsibility because those claims stemmed from the insolvent railroad's rail operations, which were conveyed to Conrail and not to the Reading Company. *Id.*

The *Schweitzer* court rejected this argument, noting that there was no evidence in the Rail Act to support the Reading Company's "dual reorganization" theory. *See id.* at 800-01 (noting that "Congress did not intend to alter a fundamental concept of reorganization law to relieve a debtor's successor and saddle a wholly-new entity that was created by Congress to serve the public interest with non-discharged claims against the debtor"). As the court observed,

> it is a fundamental principle of reorganization law that the non-discharged claims of the debtor may be properly asserted against the company which emerges as the reorganized debtor. Implicit in this fundamental principle is the concept that although the assets of the debtor may be distributed to numerous entities, the organic nature of the debtor would be reorganized into a single entity. While in the Rail Act Congress devised 'imaginative and innovative solutions in an endeavor to avoid [a] national disaster . . . one would certainly expect that if Congress intended to alter this fundamental principle of reorganization law to create two reorganized entities, such an intention would be manifest either in the language or legislative history of the Rail Act. However, a review of the structure and legislative history of the Act finds no suggestion of such an intent.

*Id.* (internal citations omitted). The court further reasoned that the dual reorganization theory was inconsistent with the purpose and structure of the Rail Act, as it would require the court to set down "an expansive and indelicate rule imposing responsibility on Conrail for all non-discharged rail obligations." *Id.* at 801-02. "Faced with the structure of the Rail Act, the Act's avowed purpose of fostering northeastern rail service, and the absence of legislative history suggesting a fundamental change in reorganization law," the court concluded that "Congress did

not intend to impose on Conrail the primary responsibility for non-discharged F.E.L.A. claims which arose from the debtor's pre-conveyance conduct." *Id*. at 802.

Conrail asserts that *Schweitzer* stands for the broad proposition that the Rail Act categorically forecloses Conrail's liability for pre-conveyance FELA claims. *See* Pl.'s Mot. at 25-26. Yet, as discussed above, the *Schweitzer* court merely held that the language, structure and legislative history of the Rail Act did not support the Reading Company's assertion that Congress intended bankruptcy courts to treat Conrail as the "reorganized company" automatically succeeding to all of the Reading Railroad's rail obligations. *Schweitzer*, 65 B.R. at 799-801; *see also State of New York v. Solvent Chem. Co.*, 6 F. Supp. 2d 186, 193 (W.D.N.Y. 1998) (distinguishing *Schweitzer* on the grounds that "the court discussed the Rail Act, but only with respect to how the Rail Act failed to support Reading's 'dual reorganization' argument"). Indeed, after rejecting the Reading Company's "dual reorganization" theory, the *Schweitzer* court proceeded to a separate examination of whether Conrail could be held liable for the plaintiffs' FELA claims under state law successor liability principles. *See id*. at 803-05 (concluding that Conrail could not be held liable in light of the fact that the Reading Company remained a going concern, as "[i]t is the general rule that where a [corporation] is not dissolved [following] a sale of assets or a reorganization, it remains liable for debts and liabilities incurred by it"). Such an analysis would have been neither necessary nor appropriate had the court interpreted the Rail Act to simply foreclose Conrail's liability for the plaintiffs' FELA claims. Accordingly, *Schweitzer* does not support the proposition that the Rail Act precludes the

application of common law successor liability principles to Conrail.[15]

In sum, Conrail has presented no authorities persuading the court to conclude that the Rail Act forecloses the application of common law successor liability principles, as proposed by the estate. Likewise, Conrail has identified no provision in the Rail Act or the Conveyance Order precluding the application of common law successor liability principles as proposed by the estate. Accordingly, the court is persuaded that the estate is entitled to judgment as a matter of law that the Rail Act does not preclude it from attempting to hold Conrail liable in the Ohio state court action based on state law successor liability principles. *See Burns Int'l Sec. Servs.*, 47 F.3d at 16 (holding that a Rule 12(c) motion should be granted when the movant is "entitled to judgment as a matter of law").

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for judgment on the pleadings and denies the plaintiff's motion for summary judgment. An Order consistent with

---

[15]    Conrail similarly overstates the holding of *Zulkowski v. Consol. Rail Corp.*, 852 F.2d 73 (3d Cir. 1988), which, like *Schweitzer*, concerned a reorganized debtor's efforts to shift liability for latent FELA claims to Conrail by arguing that Conrail was the "reorganized company" for claims stemming from the predecessor railroad's rail operations. *See Zulkowski*, 852 F.2d at 75-77. Relying on *Schweitzer*, the Third Circuit rejected this argument. *Id.* at 77 (stating that "nowhere in these citations, or elsewhere in the Rail Act, is there any provision transferring the liability for a claim of the type made here from an entity reorganized under the [Rail] Act to Conrail or otherwise relieving an entity so reorganized from such a liability"). This court rejects Conrail's attempt to transform the limited holding of *Zulkowski* into a broad rule that the Rail Act precludes the application of common law successor liability. Conrail's reliance on *United States Fidelity & Guar. Co. v. DiMassa*, 496 F. Supp. 71 (E.D. Pa. 1980), is similarly misplaced. *See id.* at 75-76 (dismissing anti-trust claims against Conrail because Conrail "did not become a successor corporation which assumed all of Reading's pre-1976 liabilities" by taking over the operating assets of the insolvent railroads pursuant to the Rail Act).

this Memorandum Opinion is separately and contemporaneously issued this 2nd day of March,

2010.

RICARDO M. URBINA
United States District Judge